**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-30 (TJK)** |
| **v.** | : | |
| | : | **40 U.S.C. § 5104(e)(2)(G)** |
| **ROBERT THOMAS SNOW,** | : | |
| **also known as "Bob Snow"** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Snow to fourteen days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

The defendant, Robert Snow, a 78-year-old man from Arkansas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Snow pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained below, a sentence of 14 days of incarceration and three years' probation is appropriate here because: (1) Snow walked through chaos on the West Plaza before reaching the Capitol Building, witnessing police using riot control agents as members of the crowd became violent; (2) he entered the U.S. Capitol Building just two minutes after the door he walked through had been violently breached; (3) once inside, Snow encouraged other rioters by waving them in and patting them on the back as they entered; and (4) he remained inside for 43 minutes, penetrating all the way to the 3rd floor of the Capitol building where few other rioters ventured and where many staff offices are located, and he left only after being directed by law enforcement officers to get on the ground and then to exit the building.

The Court must also consider that Snow's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. Snow's participation in a riot that halted the Congressional certification, combined with his role of helping the crowd advance into the Capitol Building, calls for the limited restraint on freedom of a brief period of incarceration.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Doc. 20 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed,

directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Snow's conduct and behavior on January 6.

*Robert Snow's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Robert Snow drove by himself from Heber Springs, Arkansas to Washington, D.C., about a 15-hour drive, to attend the "Stop the Steal" Rally at the Ellipse on January 6, 2021. After attending that rally, at approximately 1:15 p.m., Snow walked about 1.5 miles to the U.S. Capitol. *See* PSR ¶ 17.

Snow approached the Capitol Building from the West Plaza area. There, he was among the large and raucous crowd. *See* PSR ¶ 17. Snow witnessed individuals becoming violent toward the police. *Id*. And he was present at the front of a line of officers when the Metropolitan Police Department played a recorded warning stating, "This area is now a restricted access area," and "All people must leave the area immediately. Failure to comply with this order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon." *See* Exhibit 1. Snow is circled in yellow in the following images.

**Screenshots from Exhibit 1**



*Timestamp 00:04*



*Timestamp 00:08*

While Snow was in that area, projectiles and chemical spray were exchanged by the crowd and the police.  Rioters can be heard shouting profanities at the police, and hand-to-hand clashes between rioters and the police took place.  *See* Exhibit 2.

**Screenshots from Exhibit 2**



*Timestamp 00:20*



*Timestamp 00:36*



*Timestamp 00:55*

It appears that Snow entered the interior of the scaffolding on the West Plaza around the time that it was breached.  Video capturing Snow inside the scaffolding also shows members of the crowd shouting, "move, move, move, move!" and "push forward," and "hold the line" as the crowd pushed its way inside the scaffolding that led to the terrace and doors of the Capitol Building.  *See* Exhibit 3.

**Screenshot from Exhibit 3**



*Timestamp 02:57*

Exhibit 3 only captures Snow for seconds, and it does not reveal how deep he went inside the scaffolding.  A separate image captures Snow a bit farther inside.  *See* Image 1. Snow could have reached the Upper West Terrace of the Capitol Building by climbing through the scaffolding, but that is unknown.

**Image 1**



From the terrace of the U.S. Capitol Building, Snow cheered the crowd on by pumping his hand in the air.  *See* Image 2.

**Image 2**



At approximately 2:13 p.m., the Senate Wing Door of the U.S. Capitol building was breached when rioters broke the glass windows on either side of the door, climbed inside the building, and then kicked the door open from the inside.  *See* PSR ¶ 18; Image 3.

**Image 3**



Image 4, a still shot from a video taken from the outside the Senate Wing Door, shows a rioter kicking the door from the outside with his foot, and shows that the window glass of the Senate Wing Door was smashed during the breach.[2]

**Image 4**



---

[2] The complete video is available at https://projects.propublica.org/parler-capitol-videos/?id=Z53KwQnRVQtM, timestamp 0:10, last visited May 10, 2022.

A stream of people proceeded to enter the building through the door and the broken windows.
*See* Exhibit 4.

**Screenshot from Exhibit 4**



*Timestamp 00:47*

Snow entered through the same door at 2:15 p.m., about two minutes after the breach, as people streamed in through the door and window.  *See* PSR ¶ 19; Exhibit 4. [3]

---

[3] The exhibits referenced here are videos that will be separately provided to the Court and defense counsel.  Screenshots from those videos, as well as other relevant images, are included in this memorandum.

**Screenshot from Exhibit 4**



*Timestamp 02:50*

He was carrying a light blue cooler over his shoulder.  After being inside for a few minutes, Snow

returned to the door and began waving people in and patting many of them on the back as they

entered.  *See* Exhibit 5.

**Screenshots from Exhibit 5**


*Timestamp 00:06*


*Timestamp 00:13*


*Timestamp 00:13*


*Timestamp 00:14*

He then continued deeper into the building.  While inside, Snow traveled through many parts of the Capitol, including the Rotunda, Statuary Hall and various hallways, including one area where the crowd encountered a line of police officers blocking their way.  *See* Images 5-7.

**Image 5**



**Image 6**



**Image 7**



Snow then climbed two flights of stairs and arrived at the House Gallery on the third floor.

Snow ventured into this area despite having already seen a line of law enforcement officers on the

second floor blocking the advance of the crowd.  Few rioters made it all the way to the third floor

of the Capitol, where many Congressional staff offices are located.  While there, Snow was holding

what appears to have been a beer (presumably taken from the cooler over his shoulder) which he

placed on a counter while he leaned against it.  *See* Images 8-9.

**Image 8**



**Image 9**



While in that area, Capitol Police Officers drew their firearms and directed Snow and the other rioters present to drop to the ground.  Snow complied, but only after all of the other rioters were already on the ground.  *See* Exhibit 6.

**Screenshot from Exhibit 6**



*Timestamp 00:58*

He remained on the ground while he was searched.  Officers then instructed him to exit the building, and he complied.  He made his way back down one flight of stairs and out of the building at about 2:58 p.m.  In total, Snow was inside the U.S. Capitol Building for about 43 minutes, a lengthy period compared to the time spent inside the Capitol by other January 6 misdemeanor defendants.

Snow has admitted that when he entered the U.S. Capitol Building, he knew that that he did not have permission to do so.

*Robert Snow's Interviews*

Snow agreed to be interviewed by the FBI on June 2, 2021, and again on November 1, 2021. He told the agents that he drove by himself to Washington, D.C. to hear President Trump speak. He said that his wife did not want him to go alone due to his poor health. Snow acknowledged that he observed several chaotic scenes involving Metropolitan police officers using chemical munitions for crowd control, and that he saw several individuals becoming violent toward police and other government personnel. He said that he positioned himself in the middle of a large crowd of Trump supporters for protection and went into the Capitol building with that crowd. Snow admitted he was not expressly invited to enter the building by any official personnel, but claimed that the open doors appeared to him as an invitation to enter. He said that he was inside for about 20 minutes. Snow provided the agents with 27 photos he took while in Washington, D.C., the blue cooler he carried with him, and a cell phone that he said that he thought he had with him on January 6.

*The Charges and Plea Agreement*

On December 29, 2021, Snow was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On January 4, 2022, he self-surrendered. On January 21, 2022, Snow was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Snow promptly indicated a desire to plead guilty. On March 24, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, he agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Snow now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment, five years of probation and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of probation that includes a brief period of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also might have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, this Court should assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Snow personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Snow's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Snow from most other misdemeanor defendants.

In Snow's case, he heard the Metropolitan Police Department's admonition to leave the restricted area, and he witnessed violence and police deploying riot-control measures, but was undeterred.  He pressed forward to the Capitol Building, and entered just two minutes after it had been violently breached.  He walked through a door whose glass window had been shattered as others climbed through the window to enter.  Snow then encouraged the crowd to continue into the building by waving people in and patting them on the back.  He also pumped his fist in the air while facing the crowd from the balcony of the Capitol Building.  This conduct undoubtedly contributed to the success of the overall effort to breach the U.S. Capitol by adding to the momentum of the crowd that overwhelmed and outnumbered law enforcement officers protecting the building.  Snow also penetrated all the way to the third floor of the building, where he was stopped at gunpoint by Capitol Police Officers.  He complied with their instructions and only then did he exit the building, after about 43 minutes inside.  When approached by the FBI, Snow readily admitted his conduct and has accepted responsibility for his actions.

**B.  Snow's History and Characteristics**

Robert Snow is a 78-year-old man with no criminal history.  The PSR reports a steady history of gainful employment before his retirement.  PSR ¶ 65.  Snow also served in the military for six years in the 1960s.  *Id*. ¶ 42.  While his military service is laudable, he should have understood from that service the danger to the United States of rioters storming the Capitol building.

The defense will likely argue that Snow's age and health problems should weigh against a sentence of incarceration.  On the contrary, Snow's conduct demonstrates that neither his age nor his health limited his actions on January 6.  He drove by himself about 30 hours roundtrip to Washington, D.C. and back.  He walked about 1.5 miles to the Capitol after attending the rally at

the Ellipse, walked across the West Plaza while tear gas and projectiles were being exchanged, and still spent 43 minutes walking throughout the Capitol Building with a cooler around his shoulders the entire time. His conduct was no less serious than the conduct of many defendants who are significantly younger than him and who were also charged with misdemeanors for their role in the Capitol siege. Additionally, his age and life experiences should have inured him against the impetuousness of some of the younger rioters.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] This factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was intended by many of the rioters to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As this Court noted during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. As Judge Moss explained, this was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Snow went to great lengths to arrive at the U.S. Capitol on January 6. His claims that he was just "part of a group," and that his decision to enter the Capitol Building was a "subconscious" one, PSR ¶ 26, are similar to the explanations of many other individuals who were present that day and, like him, had no criminal history. Susceptibility to such influence, and even mob mentality, were essential ingredients to the Capitol siege. A short sentence of incarceration will help ensure that Snow understands that following the crowd does not excuse criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd,*

---

[5] Attached to this sentencing memorandum is an Appendix providing additional information about the sentences imposed on other Capitol breach defendants, and showing that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd,* 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke,* 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey,* 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler,* 1:21-cr-00365 (DLF), and *United States v. Bruce J. Harrison,* 1:21-cr-00365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales,* 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted

1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Snow has pleaded guilty to Count Four of the Information, charging him with parading, picketing or demonstrating on Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements she made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted

---

sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases for reference.

*United States v. Wickersham*, D.D.C. 1:21-CR-606-RCL, involved a defendant with many similarities to Snow.  Wickersham was an 81-year-old army veteran who was not involved with any violence or property destruction, and had no criminal history.  Wickersham, like Snow, saw rioters committing acts of violence against the police, but still entered the Capitol.  Wickersham and Snow both entered through the Senate Wing Door, about one minute apart from one another.

Wickersham exited the Capitol Building voluntarily after 20 minutes.  Wickersham voluntarily spoke with the FBI five days after January 6.  The government requested a sentence of 36 months of probation including four months of home detention, 60 hours of community service and $500 in restitution.  The court sentenced Wickersham to 36 months of probation, including three months of home detention as well as a $2000 fine and $500 in restitution.  Among the differences between Wickersham and Snows are that Snow spent more than twice the time in the building, he penetrated all the way to the third floor, and he only exited after being directed to leave at gunpoint.  A more serious sentence is needed to reflect the difference in conduct.

In another comparable case, in *United States v. Mazzocco*, the defendant, a man with no criminal history and a record of gainful employment, entered the Capitol through the Senate Wing Door at 3:10 pm (long after it had been breached), walked to the Crypt area, took several selfie photographs, and left through the Senate Wing door about 12 minutes later.  Mazzocco, unlike Snow, posted to Facebook a photograph of himself outside the Capitol with the caption, "The capital [sic] is ours!" and downplayed the seriousness of the events on social media. But also unlike Snow, Mazzocco was one of the first ten Capitol Riot defendants to accept responsibility for his conduct, reaching out to the government within days of his arrest to resolve the matter.  The other critical differences between the cases are that Mazzocco left voluntarily and did not encourage others to enter the building.  In *Mazzocco*, the government requested three years of probation, including three months of home confinement, 60 hours of community services and $500 in restitution.  The court sentenced Mazzocco to 45 days' incarceration, 60 hours of community service and $500 in restitution.  *See United States v. Mazzocco*, Case No. 21-CR-0054 (TSC) (10/4/21 Sentencing Tr.).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See United States v. Little*, No. 21-CR-315, 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (Lamberth, J.) (explaining why "a split sentence is permissible under law and warranted by the circumstances of this case") and *United States v. Sarko*, No. 21-CR-591, 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (Kollar-Kotelly, J.) ("explain[ing the Court's] reasoning for imposing a split sentence").  But this Court need not decide that question in this case because there is no dispute that a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to

26

give sentencing courts "flexibility" to impose imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id*. Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id*.

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation). A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10). *See United States v. Stenz*, 21-cr-456 (D.D.C. Feb. 17, 2022) (Howell, C.J.) (imposing imprisonment in 14-day period under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (D.D.C. Feb. 18. 2022) (Howell, C.J.) (same); *United States v. Herendeen*, 21-cr-278 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. McCreary*, 21-cr-125 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. Reed*, 21-cr-204 (D.D.C. Apr. 14, 2022) (Howell, C.J.) (same); *United States v. Watrous*, 21-cr-627 (D.D.C. Apr. 21, 2022) (Howell, C.J.) (same); *United States v. Vuksanaj*, 21-cr-620 (D.D.C. Apr. 29, 2022) (Howell, C.J.) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (*i.e.*, nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement. For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained above, those factors support a short sentence of incarceration along with a longer period of probation in this case. The government recommends that this Court sentence Robert Snow to 14 days of incarceration, 36 months of probation, 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing limited restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Alison B. Prout*
Alison B. Prout
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 581-6000
alison.prout@usdoj.gov