IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                CR No. 1:22-cr-00030-TJK-1

v.                                      Washington, D.C.
                                        Thursday, July 7, 2022
ROBERT THOMAS SNOW,                     10:00 a.m.

                    Defendant.

- - - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Alison Prout, Esq.
                          DOJ-USAO
                          Northern District of Georgia
                          Richard B. Russell Federal Building
                          75 Ted Turner Drive, SW
                          Atlanta, GA 30303
                          (404) 581-6105


For the Defendant:        Christopher Macchiaroli, Esq.
                          SILVERMAN, THOMPSON, SLUTKIN & WHITE
                          1750 K Street, NW
                          Suite 810
                          Washington, DC 20006
                          (202) 539-2444


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111



Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3     Criminal Matter 22-30, United States of America v. Robert

4     Thomas Snow.

5              Present for the Government is Alison Prout;

6     present from the United States Probation Office is Ami

7     Landon; present for the defendant is Christopher

8     Macchiaroli; also present is the defendant, Mr. Snow.

9              THE COURT:  All right.  Well, good morning to all

10    of you.

11             We are here for the sentencing of Mr. Snow.

12             Let me ask first if there is anything preliminary

13    that the Government wants to raise with me before we begin

14    and then I'll, of course, ask the same of Mr. Macchiaroli.

15             MS. PROUT:  No, Your Honor.  The Government has no

16    preliminary matters to raise.

17             THE COURT:  All right.  Same question to you,

18    Mr. Macchiaroli.

19             MR. MACCHIAROLI:  None for Mr. Snow, Your Honor.

20             THE COURT:  All right.  Very well.

21             I have received and reviewed the presentence

22    report, the sentencing recommendation from the Probation

23    Office, the updated sentencing recommendation, and the

24    sentencing memoranda both from the Government and from the

25    defendant, including the defendant's letter addressed to me.

1          Are there any other documents or materials that I

2     need to review?

3          Ms. Prout?

4          MS. PROUT:  Your Honor, the Government did submit

5     six videos electronically to chambers, as well.

6          THE COURT:  Correct.  Correct.  I should have

7     noted that, as well.  Yes, and I have reviewed those, as

8     well.

9          Mr. Macchiaroli, anything additional for me to

10    review for you?

11         MR. MACCHIAROLI:  Not from the defendant, Your

12    Honor.

13         THE COURT:  All right.  Mr. Snow, our sentencing

14    hearing today will receive -- will proceed in four steps,

15    and all the while, I want you to keep in mind the

16    seriousness of why we are here.  You committed and pled

17    guilty to a federal crime, and today's proceeding is about

18    the consequences that you will face as a result of your

19    decision to commit that crime.

20         The first step of today's hearing is for me to

21    determine whether you and your lawyer have reviewed the

22    presentence report and whether there are any outstanding

23    objections to that report and, if so, to resolve those

24    objections.

25         The second step is usually for me to determine

1   what sentencing guidelines and sentencing guideline range

2   imply -- applies in your case based on your criminal history

3   and considering any mitigating or aggravating factors that

4   may warrant a departure under the sentencing guidelines, but

5   in this case, you have pled to a misdemeanor, and so the

6   sentencing guidelines do not apply, but even so, I will

7   clarify the sentencing framework that we are operating

8   under.

9           The third step is for me to hear from the

10  Government, from your counsel, and then from you if you wish

11  to be heard, about sentencing in this case.

12          And the last step requires me to fashion a just

13  and fair sentence in light of the factors Congress has set

14  forth in 18 United States Code 3553(a), and as part of this

15  last step, I will actually impose the sentence along with

16  any other required consequences of the offense.

17          So let's talk first about the presentence report.

18  The final presentence report and sentencing recommendation

19  -- well, let me just get this exactly right -- it was June

20  30th that the final presentence investigation report was

21  submitted.  The recommendation of the PSI report, it wasn't

22  changed in any material way, I guess I would say, in terms

23  of what was -- what is recommended, but the recommendation,

24  then, was revised just yesterday on the 6th.

25          Does the Government, first, have any objection to

1      any of the factual determinations set forth in the

2      presentence report?

3              MS. PROUT:  No, Your Honor.

4              THE COURT:  All right.  And, Mr. Macchiaroli, have

5      you and your client read and discussed the presentence

6      report?

7              MR. MACCHIAROLI:  We discussed the presentence

8      report.  We also discussed the factual summary and the

9      initial recommendation from U.S. Probation.  We suggested

10     revisions to both.  All have been made, and we have no

11     further objections.

12             THE COURT:  All right.  And I did -- of course, I

13     went back and wondered what had changed, and I see what was

14     changed and I think that seems, obviously, appropriate to

15     me, as well.

16             All right.  Very, very well.  So then if neither

17     side has any objection, the presentence report will be my

18     findings of fact for purposes of this sentencing.

19             All right.  So now, we -- next, we go to the

20     sentencing framework, if we will.

21             As a preliminary matter, Congress has imposed a

22     statutory maximum sentence for the offense to which Mr. Snow

23     has pled guilty.  The statutory maximum is six months'

24     incarceration for this Class B misdemeanor.  As far as

25     probation goes, the defendant is eligible for up to five

1    years of probation under 18 United States Code Section

2    3561(c)(2).  The maximum fine for this offense is $5,000.

3    And there is also a mandatory special assessment of $10

4    under 18 United States Code Section 3013(a).  There is an

5    open question about whether I can impose a split sentence of

6    jail and probation, but as I have done in all the other

7    cases that have presented this question, I'm going to put

8    that aside and resolve it only if I otherwise would have

9    thought a split sentence was appropriate.

10              So with that caveat; with that kicking the can

11   down the road on that one legal question, have I accurately

12   stated the statutory framework under which we are operating

13   in regard to this case?

14              Ms. Prout?

15              MS. PROUT:  Your Honor, the Government agrees with

16   the Court's statements.

17              And I apologize.  I probably should've raised this

18   as a preliminary matter, but it may be appropriate to just

19   confirm that the defendant consents to proceed by video.  It

20   may not be necessary, given that he filed a motion to

21   proceed this way, but it -- I should have raised that

22   earlier, and I apologize.

23              THE COURT:  No, no, that's something that I should

24   have done.  I shouldn't have let the parties -- I shouldn't

25   have relied on the parties for that.  You are correct in

1     that.  And, obviously, we have -- we are proceeding by video

2     here today and, as you said, the defendant -- in this

3     particular instance, we did go back and forth about whether

4     we would proceed in person or not.  I think almost all the

5     sentencings that I have done, short of the individual being

6     incarcerated at the time of sentencing, for quite a while,

7     I've tried to do in person, and in this case, I made an

8     exception at Mr. Snow's request, but I think you are right.

9            Mr. Macchiaroli, can I just have you confirm for

10    me that your client consents to going forward today under

11    the CARES Act via videoconference as we are proceeding here

12    today.

13            MR. MACCHIAROLI:  Absolutely, Your Honor.  In

14    addition to that authority that the Court has, I would note

15    that the basis of our motion was, in fact, the rules of

16    procedure that allow for a misdemeanor offense of this

17    nature to proceed remotely if the parties consent, and the

18    Government has consented; Mr. Snow consents to it.  So

19    there's another statutory authority for these petit

20    misdemeanor offenses to proceed remotely.

21            THE COURT:  Fair enough.  Under the -- it sounds,

22    then, like I -- the -- we wouldn't even need the CARES Act

23    to proceed this way, but given Mr. -- but I will go ahead

24    and make the additional finding that I need to make under

25    the CARES Act that we could not -- this proceeding could not

1    be delayed without serious harm to the interests of justice.

2    Given Mr. Snow's obvious desire to resolve the case, as

3    reflected in the record -- all over the place in the record,

4    I would find under the CARES Acts that serious harm to the

5    interests of justice would take place if we did not go

6    forward today via videoconference.  In any event, that's

7    not, as you all know, a substitute for him having consented.

8    It's just an additional finding I need to make under the

9    CARES Act.

10           In any event, thank you for raising that,

11   Ms. Prout.  I think, because it is something we had gone

12   back and forth about, I think, in -- it was that reason that

13   I didn't raise it initially.

14           All right.  Returning, then, to my laying out of

15   the sentencing framework, Mr. Macchiaroli, do you agree that

16   I've accurately stated that framework?

17           MR. MACCHIAROLI:  Absolutely, Your Honor.

18           THE COURT:  All right.  Very well.

19           I must now consider the relevant factors Congress

20   set out under 18 United States Code Section 3553(a) and

21   ensure I -- that I impose a sentence that is sufficient but

22   not greater than necessary to comply with the purposes of

23   sentencing, and those purposes include the need for the

24   sentence imposed to reflect the seriousness of the offense,

25   to promote respect for the law, and to provide just

1    punishment for the offense.  The sentence should also afford

2    adequate deterrence to criminal conduct, protect the public

3    from future crimes of the defendant, and promote

4    rehabilitation.  And in addition to the guidelines and

5    policy statements, I must consider the nature and

6    circumstances of the offense; the history and

7    characteristics of the defendant; the need for the sentence

8    imposed to comply with the purposes that I just mentioned;

9    the kinds of sentences available; the need to avoid unwanted

10   sentence disparities among defendants with similar records

11   who have been found guilty of similar conduct; and the need

12   to provide restitution to any victims of the offense.

13           So why don't I turn it over, then, to you,

14   Ms. Prout, regarding the Government's views on the

15   application of the 3553(a) factors and the Government's

16   sentencing recommendation.

17           MS. PROUT:  Thank you, Your Honor.

18           The Government's sentencing recommendation in this

19   case is based on an analysis of all the 3553(a) factors, and

20   I believe that several of those factors do weigh in favor of

21   leniency while others do favor a somewhat more serious

22   sentence, and on balance and after careful consideration of

23   all the factors, the Government has recommended a period of

24   incarceration, but a very limited one, of 14 days coupled

25   with 3 years of probation, 60 hours of community service,

1    the agreed-upon $500 restitution payment, and the mandatory

2    $10 special assessment.

3            And while we have analyzed all of the factors in

4    our sentencing memorandum, I'd like to focus on three today.

5    Before I do, though, I did want to address the issue of the

6    defendant's age and health, because I think that is one of

7    the central things raised in the PSR and by defense counsel,

8    and it is one way that Mr. Snow is a little bit different

9    than some of the other January 6th defendants.

10           With regard to the defendant's age and health, the

11    Government first considered whether his physical condition

12    rendered him too unhealthy or unable to serve a brief period

13    of incarceration that we've requested, and what we

14    considered was the evidence before us about his physical

15    abilities and his stamina, both of which were considerable.

16    We noted that someone who can drive 15 hours from Arkansas

17    to Washington, D.C.; stand outside at a rally in the winter

18    for hours; walk a mile-and-a-half from the Ellipse to the

19    Capitol; and then spend nearly 45 minutes walking about

20    inside the Capitol building does not appear to be

21    substantially limited by physical ability as far as his age

22    or health goes.

23           We also did consider whether his age and health

24    suggested a lower likelihood of recidivism, and with the

25    exception of Mr. Snow's eye condition, it appears that he

1   was in substantially the same physical condition when he

2   committed this crime.  It was about a year-and-a-half ago.

3   So he's -- we're all, I guess, about a year-and-a-half

4   older, but other than that, substantially similar.  And so

5   it was difficult for us to conclude that his age or health

6   would make it less likely for him to commit the same type of

7   crime again.  And for those reasons, we concluded that the

8   defendant's physical condition did not in itself warrant a

9   different sentence than what we would recommend for any

10  other defendant involved in the January 6th events.  And so

11  with that, I'll address what I believe are some of the main

12  3553(a) factors here.

13          First and, I would say, most importantly, I would

14  ask the Court to consider the nature and circumstances of

15  this particular offense; that is, the defendant's individual

16  role in the siege of the United States Capitol.  Of course,

17  this case does not involve any type of violence or property

18  damage by the defendant, and that's why we're here on a

19  misdemeanor conviction.  Nonetheless, his conduct is very

20  serious.  To begin, we believe it is significant that the

21  defendant witnessed violent clashes with the police on the

22  West Plaza before he approached the Capitol building.  Not

23  only that, but he was present when the anti-riot recording

24  played outside telling the crowd to leave immediately and

25  that they were subject to arrest or an impact weapon if they

1   remained present.  So when the defendant told agents in his

2   interview that open doors of the building seemed like an

3   invitation to enter, I would submit that may have been a

4   little bit disingenuous given the context in which he was

5   present.

6            Despite all that he saw and he heard, the

7   defendant walked up to the Upper West Terrace, he raised his

8   fist in triumph to the crowd, and then he entered the

9   building.  He went through the doors of which the glass had

10  been broken just two minutes earlier.  And we don't suggest

11  that it's significant because the defendant himself broke

12  anything, but it is important because it indicates what he

13  saw and what was happening around him when he proceeded

14  inside.  And Mr. Snow, then, stood in the interior of that

15  door and waved people inside and patted them on the back.

16  The defense argues that patting people on the back supports

17  leniency, but the Government sees that in the exact opposite

18  way.  We believe that small acts like this, in fact,

19  encouraged the people coming in behind him.  And the time

20  that this occurred is significant or relevant.  The time was

21  about 2:20 p.m.  So it was relatively early in the breach of

22  the building before a lot of the terrible acts occurred like

23  the shooting of one of the rioters before some of the other

24  doors were breached.  So bringing more people into the

25  building at that point absolutely impacted the effectiveness

 1    of this siege overall.

 2            But Mr. Snow didn't stop there at the entryway and

 3    walk outside and go home like some other rioters we've seen

 4    did.  He went to the second floor and then he, again, went

 5    up to the third floor, an area where few rioters, in fact,

 6    ventured that day, and it was only after being directed to

 7    leave at gunpoint that he exited the building, and in total,

 8    he was there for about 43 minutes.  This conduct

 9    distinguishes him from many others who were also convicted

10    for parading and demonstrating.  Some got a few feet inside,

11    realized it was a mistake, and left after a few minutes;

12    some arrived much later in the timeline and were not present

13    around the time of some of those outside clashes and doors

14    being broken into; and some actually went in and helped

15    others inside, whether other rioters or other members of law

16    enforcement; and, finally, most of the other rioters left of

17    their own accord without being need -- needing to be

18    confronted by police and, in this case, at gunpoint and

19    directed to leave.  And so for those reasons, we believe

20    that the defendant's conduct is more serious than many of

21    those convicted of the same offense, though certainly not

22    the most serious in that scale.

23            With regard to his conduct, I did want to address

24    the concept of cooperation which is something raised in the

25    defense sentencing memorandum.  "Cooperation" is a word that

1    sometimes is used to mean different things, and the
2    Government typically uses the term "cooperation" to refer to
3    a defendant who substantially assists in the prosecution of
4    another individual whether by wearing a wire or providing
5    previously unknown information about another target or a
6    defendant, and I absolutely want to credit Mr. Snow for what
7    he did do, but I wanted to also make clear what that was and
8    what it wasn't.  When Mr. Snow was approached by the FBI
9    five months after the riot, he absolutely did agree to speak
10   with them, and he did admit to his conduct, and we credit
11   him for that.  He did so, again, a second time about five
12   months after that.  And he provided the Government with
13   certain evidence, including photographs, the cooler [sic]
14   that he was wearing, he identified himself in photos, all of
15   which is to his credit and did assist in the prosecution of
16   this case.  He provided a cell phone to the Government,
17   although that phone didn't have any data from January 6th on
18   it.  He said he wasn't sure which phone he brought that day
19   and he may have given his phone from that day to a family
20   member.  In any event, he provided a phone, but it didn't
21   actually have any information on it.
22          When Mr. Snow is arrested -- and he was permitted
23   to self-surrender in his arrest as a courtesy -- but he did
24   decline to speak further with agents at that point, invoking
25   his right to counsel which was certainly his right to do so.

1       So all in all, he spoke with agents two times and did admit

2       his conduct and provided certain evidence, and that is

3       laudable conduct, but it is not conduct that necessarily

4       distinguishes him from many other defendants who also agreed

5       to speak to agents about their conduct after being

6       confronted with the evidence that they had entered the

7       building that day.  He didn't, for instance, preemptively

8       turn himself in before being identified by law enforcement,

9       and he didn't reach out and offer to plead guilty before

10      charges were filed against him, all things he was entitled

11      to do, but I point this out merely because I think the

12      defense's characterization of him providing substantial

13      assistance in the form of numerous meetings and conferences

14      may somewhat overstate the picture here.  Nonetheless, his

15      prompt acceptance of responsibility and his voluntary

16      interviews are important acts that do weigh in his favor and

17      should be factored into his sentence.

18              And with that, I'd like to turn to, I think, the

19      second factor that I focused on which is the defendant's

20      history and characteristics.

21              THE COURT:  Can I just --

22              MS. PROUT:  This --

23              THE COURT:  Can I -- Ms. --

24              MS. PROUT:  Yes.

25              THE COURT:  Ms. Prout, can I just raise a few

1    points about --

2              MS. PROUT:  Of course.

3              THE COURT:  -- your first point.  I think -- I'm

4    sure Mr. Macchiaroli is going to hit this in -- when I hear

5    from him.  I do think -- and I've heard the Government talk

6    to me -- argue this to me in other cases as well in

7    trying -- in distinguishing the defendant's conduct on

8    January 6th that day, talking about things that he saw, and

9    I'm not going to say to you that those are -- things are

10   irrelevant.  I agree with you that it is -- it's not nothing

11   that a person would continue forward having seen violence or

12   having seen certain things, but, you know, in the grand

13   scheme of what I have to weigh, I think Mr. Macchiaroli is

14   right on his -- in the sense that we're -- when we're

15   talking about things that really have a material impact on

16   how I look at his case, I've got to focus on things that

17   he -- his client, Mr. Snow -- did and didn't do.

18              So I mean, I think -- I understand the Government,

19   you know, raising these facts about what he saw and even

20   things that he did like waving people in which is different

21   than what he saw, but I guess in either case, to me -- while

22   I'm not saying it's not relevant, to me, it's -- whatever

23   relevance it has is very small compared to material ways in

24   which he might have truly assisted other rioters -- all the

25   things that you're going to tell me, Look, maybe, we'd be

1    here -- we wouldn't be here with a misdemeanor if that --

2    those were the facts, and that's a fair response, but I

3    think I just want to make clear that in the main -- I think

4    what a defendant saw is -- has very limited -- it moves the

5    needle very little to me in terms of sentencing.  Now, it,

6    you know -- again, putting aside what -- it could be

7    relevant in proving a crime -- in proving the crimes that

8    he's already admitted to.  The other thing I just wanted to

9    -- no, I guess that's it.  I just wanted to make that point;

10   that I think the things you've raised are fair, but I just

11   don't know how much they move the needle for me in terms of

12   really thinking about, as a practical matter, what the

13   appropriate sentence is.

14           Oh, I guess on the cooperation part, look, I --

15   how does -- whether -- so one aspect of that is all the

16   things you've raised, Ms. Prout, about, you know, there are

17   different -- putting aside what substantial assistance and

18   what true cooperation means, there are all sorts of ways

19   that a defendant can come forward and take responsibility,

20   you know?  They -- maybe, he hasn't done every single thing

21   he could, but he's done a lot, and I wondered on those --

22   kind of, on that score, how the Government sees -- I don't

23   know whether you'd think of this as a -- kind of, as a

24   nature and circumstance of the offense or, maybe, you're

25   going to talk about it in terms of his characteristics, but

1    he -- Mr. Snow submitted a statement, and I found that

2    statement to be very -- and, maybe, he's even going to speak

3    to me today.  I don't know.  But it -- at least before me

4    now, I have a statement of his, and I've had plenty of

5    January 6th -- defendants generally, and also, January 6th

6    defendants who are not nearly that fulsome in their, you

7    know -- in how they take responsibility for what they did.

8    And so how does the Government -- whether you call that the

9    offense -- or probably you'd call that one of the

10   characteristics of the defendant.  But how does the

11   Government weigh that?  Because I think I -- I think that's

12   something I do have to weigh particularly in a situation

13   where, you know, I think there are plenty of folks out there

14   who really don't get that they did something wrong, quite

15   candidly, and that's an important part of -- it seems to me

16   that's an important part of taking responsibility for your

17   actions.

18            MS. PROUT:  Your Honor, thank you for both of

19   those points.  And, you know, I think what we've seen is

20   there's somewhat of a universal agreement about the factors

21   at play in these cases and there tends to be somewhat of a

22   difference of view about the relative weighting of many of

23   those factors.  And I take the Court's point to heart about

24   the difference between what a defendant sees and what a

25   defendant does.  I do believe that what a defendant sees

1    informs our evaluation of what the defendant does next.  And

2    in some cases, I believe the Government has focused on what

3    the defendant sees because we've heard many times arguments

4    like the defendants were just tourists or they thought they

5    were, and that's not something we've heard from Mr. Snow,

6    but I think nonetheless it's important to paint that full

7    picture.  In the case of Mr. Snow and the timeline of what

8    he saw and then what he did, I do find it significant that

9    after being informed that he was in the presence of a riot

10   and after witnessing the violence that he did, he did

11   encourage the crowd.  He pumped his fist in the air and he

12   invited others in.  And I recognize that the Court may view

13   that differently, but that is my view and, I believe, the

14   Government's view on the significance there.

15          THE COURT:  I -- egging the crowd on is a stronger

16   -- I mean, I think, you know -- again, in the relative

17   weighting of all this, I think the various ways folks egg --

18   could egg the crowd on, that starts to get more traction

19   with me about something that's relevant, for sure, you know,

20   but, obviously, that's -- there are a lot of ways to do that

21   and that can -- that could -- you could see ways in which

22   that's, you know, very material and ways in which it's less

23   so, but anyway, fair enough.

24          MS. PROUT:  No, I appreciate that.  And with

25   regards to cooperation as well, I think there, you know --

1    we have a spectrum of conduct that we've seen from a number

2    of defendants and, absolutely, Mr. Snow should be credited

3    for his cooperation and for his statement of acceptance.

4    That was a factor I was planning to raise with regard to his

5    history and characteristics, but I'll address it now because

6    I do agree that his letter of apology appeared to be sincere

7    and appeared to truly accept the wrongfulness of what took

8    place that day which is not something we've seen --

9              THE COURT:  Right.

10             MS. PROUT:  -- and --

11             THE COURT:  We have plenty of cases -- I don't

12   have, you know -- I don't have -- I, you know -- I've had

13   plenty of cases where the person does plead guilty, but I

14   don't get the sense they really understood what they did was

15   something that was wrong, and that strikes me as an

16   important marker in Mr. Snow's -- in his corner --

17             MS. PROUT:  I do agree with you, Your Honor, and,

18   you know, one of the statements that Mr. Snow made in his

19   letter was something along the lines of, My mind was putting

20   aside the ramifications of what I was now a part of and I

21   was caught up in the moment, and I took a note of that

22   because it ties a little bit into both what you said about

23   what he saw beforehand and, I think, considerations of

24   deterrence, and I don't think in this case that specific

25   deterrence is of paramount concern, but I do think that the

1    concept of being caught up in the moment is a very common

2    description of what led a number of folks to go forward as

3    they did that day.  And I, you know -- is that aggravating

4    or mitigating?  I'm not sure, but I don't consider it to be

5    an excuse.  I consider it to be something that can be a bit

6    frightening, because it's very easy to see how we can find

7    ourselves in another inspiring moment that leads to some

8    similar mob mentality.

9          THE COURT:  I agree with you, and you can imagine

10    a scenario where someone says, I was caught up in the

11    moment.  It was no big deal.  That's very different than, I

12    was caught up in the moment, but I offer that not as an

13    excuse but as an explanation and I recognize it was wrong

14    and I'm very sorry, which is more along the lines of what we

15    have here.

16          MS. PROUT:  I agree with you completely about that

17    distinction, and we're certainly in the latter case here.

18          And to continue on the subject of the defendant's

19    history and characteristics, those are certainly the factors

20    that warrant leniency.  The defendant absolutely has a

21    long-time history of a law -- leading a law-abiding life; he

22    has a long history of employment, both of which are to his

23    great credit and are the main reasons that the Government

24    did not request a longer sentence in this case.

25          I would also just note here with regard to the

1   defendant's need for surgery, this is not something the

2   Government has disregarded.  I was, unfortunately, unable to

3   move the sentencing date earlier due to out-of-country

4   travel but did propose the opportunity to delay the

5   sentencing if that would enable the defendant to have his,

6   (inaudible) -- at the time.  That was not something they

7   opted to do, but it's not something that we are unaware of

8   or insensitive to.

9          I guess stepping back for a second, looking at the

10  nature and circumstances of the offense and the history and

11  characteristics of the defendant, I would argue that they

12  weigh in slightly opposite directions.  The nature and

13  circumstances does have some aggravating factors in the

14  Government's view.  The defendant's history and

15  characteristics warrant leniency.  And for that reason, I

16  will turn to the final factor to focus on, I believe, which

17  is the need for the sentence to reflect the seriousness of

18  the offense and promote respect for the law, and I recognize

19  this is a factor that is general to January 6th defendants,

20  but the Government does believe that this factor weighs in

21  favor of incarceration, and though it has been said many

22  times in other settings, I do think it bears repeating that

23  the attack on the United States Capitol was an attack on the

24  rule of law.  The violence and destruction that took place

25  that day showed a shocking disregard for our institutions

1    and the orderly administration of the democratic process,

2    and we're still feeling the ripple effects of that day

3    today, and it is truly difficult to imagine a more serious

4    offense to our community and to our nation than the one that

5    was posed by each and every individual who knowingly engaged

6    in the breach and occupation of the Capitol in order to stop

7    the certification of a lawful and fair election.

8         Every person, including Mr. Snow, who was present

9    without authority in the Capitol on January 6th contributed

10   to the chaos of the day and the danger posed to law

11   enforcement, the vice president, members of the Congress,

12   and to the peaceful transition of power, and no rioter acted

13   in a vacuum.  It was the collective action of each and every

14   one who contributed to property damage and destruction and

15   the fear that those present experienced that day.  And so

16   while we sincerely hope that specific deterrence in this

17   case is only a minor consideration, general deterrence does

18   require not merely prosecuting each defendant, as the

19   defendant suggests would be enough, but also imposing

20   impactful sentences.

21        And it's in consideration of all of the 3553(a)

22   factors, but those three in particular, that the Government

23   has attempted to balance the good and the bad, has attempted

24   to place Mr. Snow in the context of many, many other

25   defendants who have come before these courts, that we are

1    recommending the sentence of 14 days' incarceration which, I

2    would add, we believe can be imposed without making a

3    decision on the split sentence question by relying on the

4    probation statute 3563(b)(10) which permits intermittent

5    incarceration.

6              THE COURT:  Yes.

7              MS. PROUT:  And in conjunction with the 14 days,

8    as I stated, we're seeking 3 years' probation and the other

9    aspects spelled out in our sentencing memorandum.

10             And I'm happy to address further questions, but

11   that's the end of my allocution, Your Honor.

12             THE COURT:  All right.  No, I have no further

13   questions.

14             Mr. Macchiaroli?

15             MR. MACCHIAROLI:  Your Honor, I have thought long

16   about what I was going to say at this sentencing for months

17   now, and I have talked about it with Mr. Snow periodically

18   during that period of time.  Let me begin by saying it's an

19   honor to represent Mr. Snow.  I hope, in much less time than

20   the Government has spent, to try to convince you that

21   Mr. Snow's conduct in this case and his life and history

22   does not justify the sentence the Government is asking for.

23   I will address some of the points that Ms. Prout made, but I

24   think it's very important for all of those who are watching

25   this proceeding and listening to this proceeding all across

1      the country -- because Mr. Snow told me his photograph, his

2      name was all over the news -- local news this morning -- is

3      that Mr. Snow regrets sincerely and wholeheartedly his

4      participation on January 6th.  He has looked at my

5      sentencing memorandum before I filed it on his behalf.  He

6      agreed what was contained therein, is that his mere

7      participation; that his presence on January 6th; that his

8      entering in the Capitol is on -- a blemish on his life which

9      will last him long when he has left us.  There is deterrence

10     for his conduct.

11             And I think it's important to note -- and I think

12     the Government grudgingly even concedes this -- is that

13     Mr. Snow has lived a life devoid of any criminal activity.

14     His first arrest was his arrest in this case after 78 years.

15     He has served in Vietnam.  He served industries that helped

16     our country.  He's had no problems with drugs or alcohol.

17     He's lived a life of honor.  That changed on January 6th.

18     And yes, what happened on January 6th was a terrible event,

19     especially for people like myself who live in the --

20     Washington, D.C.; know people who work in the Capitol; and

21     Mr. Snow shares that sentiment, as well.  But in these

22     sentences, it is so important to put aside the general event

23     of January 6th and evaluate each specific defendant and look

24     within the timeline of what they did, how they acted, how

25     they responded to that event.

1          And I just want to briefly, Your Honor -- I know

2     this is in the defendant's sentencing memorandum, but

3     Mr. Snow entered through an open door.  He didn't break any

4     windows.  He didn't smash anything.  He didn't push people

5     out of the way.  He didn't assault any officers.  In fact,

6     every officer he spoke to was very similar to any other

7     person of his age wanting to have a conversation.  And the

8     last image of him leaving the Capitol on his way out is a

9     Capitol Police officer with his hand on Mr. Snow's shoulder,

10    not pushing him out, not grabbing him, but engaged in a

11    friendly conversation.  Mr. Snow didn't harass anybody;

12    didn't threaten anybody; didn't say the vile things that we

13    see in the various videos that you've watched, Your Honor,

14    in these numerous cases; didn't -- I -- support attacking

15    anybody.  When -- there was an incident where some

16    individual was playing with a fuse box.  He alerted law

17    enforcement therein.  And then when he left, you know, he

18    didn't steal anything; didn't deface any property.  He

19    simply went in; he simply went out.

20          To justify a sentence of 15 days, the Government

21    would say that he saw chaos going on.  I would submit to

22    this Court, anyone who went into the Capitol that day saw,

23    at some point, chaos and assaultive conduct.  And yes, he

24    had his hand in the air and he patted some people on the

25    back as they walked in, but he is not involved in any, you

1  know, right wing conspiracy or militant group or any kind

2  of, you know, deniers.  There has been no Facebook post, no

3  text message, anything condoning his conduct or supporting

4  the attack on the Capitol or anything like that.

5         And then when we actually look at what Mr. Snow

6  faced when law enforcement came to him, we juxtapose that

7  from all the other defendants that have come before this

8  Court.  Mr. Snow didn't not talk to law enforcement;

9  Mr. Snow didn't delete his photos; Mr. Snow didn't, you

10  know, say that what he did was justified.  He had

11  conversations with the FBI agents -- FBI Agent Kooch, who I

12  believe is on watching this proceeding, as well -- and he

13  provided photos; he provided the stuff he wore that day; he

14  answered as many questions as he possibly could.  For

15  someone who's been involved in the criminal justice system

16  like myself, it is extremely unusual that defendants not

17  only talk to law enforcement but agree to provide them

18  evidence; that agree to send them emails to the FBI; that

19  agree to have conversations and look at photos and identify

20  themselves and do everything one could possibly happen [sic]

21  even before they even are charged with a crime in this case.

22  I agree, this is not something that goes to the Departure

23  Committee over at the U.S. Attorney's Office, but it is a

24  factor that further justifies leniency in this case.

25         And Mr. Snow, from the moment that he talked to

1    law enforcement to the present day -- and he is also going

2    to speak, again, in addition to this statement that he

3    wrote -- sincerely and remorsefully takes responsibility for

4    the actions that he did in this case, because he regrets his

5    just mere presence and participation on that day, but, Your

6    Honor, when you look at his history and life and

7    characteristics, it all indicates leniency in this case.  I

8    have never seen a U.S. Probation draft PSR that has a

9    departure section when a departure is not even applicable

10   for a misdemeanor offense and lists in detail better than I

11   would do as the advocate for Mr. Snow why leniency is

12   appropriate in this case.

13        I just want to make two additional points and then

14   I'm going to ask Mr. Snow if he would like to speak, because

15   I know he wants to address the Court.

16        Number one is, what is the appropriate sentence in

17   this case?  And I would submit that Mr. Snow has -- life has

18   been drastically changed by the events of January 6th by his

19   mere participation and the result of being charged.  He has

20   received, you know, phone calls from crazy people calling

21   him which he's reported to law enforcement.  He's had to

22   deal with, you know, being locked up in a cell and waiting

23   to be, kind of, brought out to court.  He's had, you know --

24   been on supervision.  He's been 100 percent, you know,

25   compliant.  He has had to deal with his community turning a

1    shoulder to him and to his wife because of his participation

2    on January 6th.  There has been deterrence for his conduct.

3    And somebody who lived a noble life will end today with a

4    federal conviction which is deterrence more than anyone

5    could possibly ask for.

6            And I would just ask, you know, the Court and the

7    Government, through the Court, is what is served by the

8    period of probation in this case?  Mr. Snow, according to

9    U.S. Probation, is -- has no risk of recidivism.  He is not

10   a danger to the community.  He's been 100 percent compliant

11   on pretrial.  Is there a need for a watchful eye over him?

12   For what?  He's not taking mental health courses.  They're

13   not needed.  There -- Pretrial didn't believe he needed to

14   be drug tested, even though Probation thinks he should go

15   through three drug tests and has no history of drugs.  His

16   restitution payment of $500 and the special assessment,

17   Mr. Snow tried to pay that before the sentencing, but the

18   Clerk wouldn't accept it.  I have both of those checks from

19   Mr. Snow sitting here at my table and I plan to, after this

20   proceeding, before I see Judge Leon this afternoon, file

21   them in the Clerk's Office to satisfy the restitution

22   payment, to satisfy the special assessment.  Probation is

23   not required to monitor that.

24           This is somebody who has paid the price, and he

25   accepts the price that he has paid, and we ask this Court

1    for leniency.  All due respect to the Government, this case

2    screams out to say, why is the Government asking for 15 days

3    of incarceration?  In the sentencing memorandum, we went in

4    detail and explained this is inconsistent with how the

5    Government has asked for sentences of similar defendants and

6    defendants who committed even more conduct, and this is not

7    a reflection of Ms. Prout.  It's not a reflection of the

8    special agent.  This is a reflection of, kind of, guidelines

9    that the U.S. Attorney's Office and the Department of

10   Justice is putting out for these cases.  The ball has been

11   moved, but it should not be moved on this case and for this

12   defendant.  There is ample, ample evidence in the

13   defendant's sentencing memorandum that this is not a

14   sentence of 15 days of incarceration.  It's just not

15   justified on what actually occurred in this case and the

16   history and characteristics of Mr. Snow.  That goes from his

17   conduct inside the Capitol to his conduct when he contacted

18   law enforcement -- or when law enforcement contacted him and

19   to his statements to this Court today.

20           I would just note, Your Honor -- and I had to

21   look, and I was startled when I looked back at this --

22   Mr. Snow was interviewed by Special Agent Kooch on June 2nd

23   of last year.  It's been 13 months that the Government has

24   known about his full acceptance of responsibility.  And from

25   that moment on June 2nd, he wasn't on any kind of

1   supervision or any kind of concern about him being a danger

2   to the community or speaking out at some events or being

3   part of some, you know, revolutionary force, and even when

4   he was on supervision on -- in January, he was on the

5   most -- least restrictive supervision possible because of

6   his life and history and characteristics, and while on

7   supervision, he's been 100 percent compliant.

8           I think it's very hard to argue that because

9   somebody was able to walk in the Capitol and drive to

10  Washington, D.C., that means that they're completely healthy

11  to, you know, serve a sentence in some correctional facility

12  somewhere in the country.  I will note that age affects

13  people differently at their respective age, and Mr. Snow is

14  78.  He's had -- he needs surgery on his eye.  He walks a

15  lot with a cane.  He has been wearing a patch, for a number

16  of proceedings, over his eye.  He is in very bad medical

17  condition, and we have outlined that.  We've provided the

18  information to U.S. Probation.  U.S. Probation credited

19  that.  They had authorizations to investigate whether, you

20  know, what Mr. Snow was saying was accurate.  The Government

21  had every right to inquire of the defendant if there was any

22  documentation to support his, you know, conditions.

23          This is somebody who has accepted responsibility

24  wholeheartedly.  He acknowledged from the very moment in

25  June of last year when the FBI came to his house that what

1    he did was wrong and admitted to his conduct, and that he

2    has gone through this proceeding as honorably as he could,

3    even asking this Court to move up the plea hearing so he

4    could accept responsibility quicker.  I began this -- in my

5    sentencing memorandum, I said, is there not much more we

6    could possibly ask from a criminal defendant than what

7    Mr. Snow has done in this case?  And I ask that this

8    Court -- looking at all the other, you know, statistics of

9    similar January 6th defendants and their -- the Government's

10    allocutions and the sentencings, I submit to this Court that

11    this is one of the most less culpable of defendants that I

12    have seen from any of the 850 currently being charged by the

13    Government of which additional people are to be charged.

14            And with that, I, you know -- if the Court has any

15    -- would like Mr. Snow to speak, I believe he has some

16    statements to make.

17            THE COURT:  Mr. Snow -- I don't have any further

18    questions from you, Mr. Macchiaroli.

19            And I will hear from Mr. Snow if he wouldn't [sic]

20    like to make an additional statement.

21            THE DEFENDANT:  Yes, Your Honor.  I thank you for

22    this time to do that.

23            I have this past week, as you know, Your Honor,

24    submitted through my counsel my written personal statement

25    to the Court for your consideration.

1          THE COURT:  And I read it.

2          THE DEFENDANT:  I hope it provided the Court with

3     some insight as to how I truly feel about the terrible

4     events of January 6th, 2021.  What started out to be a

5     happy, patriotic event for me that morning soon in the late

6     afternoon turned toward something becoming very, very dark

7     for the country and now for me personally.  It was far

8     beyond anything I or anyone could have imagined.  It turned

9     into a nightmare.  I hope that my personal written statement

10    to the Court reflects my deepest sorrow for my part in that

11    tragedy of that day.  My written statement, Your Honor, is

12    not meant to provide an argument.  It's not meant to provide

13    a defense, nor an excuse for my actions that day as none

14    exists.  I can only hope that my own words expressed in that

15    statement will provide the Court with some reasonable, just,

16    and what I believe a true explanation of why.  I have

17    searched deep inside of myself, Your Honor, to find reason,

18    to find an answer to my own question as to why.  Why did I

19    enter that building at that time on that day?

20          Let there be no doubt that I admit I did wrong in

21    going to the Capitol building that day and that I know I

22    will suffer personal shame for that mistake for many years

23    to come.  Maybe indeed the rest of my life.  I do accept

24    that I alone am responsible for my actions.

25          I offer my true apology to my family; to my

1    friends, if there are any left; to my community; and indeed

2    to my nation; and to all who may have been offended by my

3    action.  I offer my sorrow to all those who suffered

4    physical and lasting emotional injury from the events of

5    that day.

6         I would also like to include a special apology,

7    Your Honor, directly to the Capitol Police officers.  While

8    under great strain and abuse, they took the time to show me

9    their professionalism and absolute courtesy in my friendly

10   interactions with them.  I offer them thanks and my personal

11   apology.

12        To this Court specifically, I offer with all of my

13   spirit my deep sorrow, my heartfelt apology.  Mea culpa.

14   Mea maxima culpa.  My own actions on January 6th are truly

15   on me.  I am truly sorry.

16        In final, I would ask Your Honor that you consider

17   and accept my personal statement and this as my true and

18   sincere apology to this Court.

19        Thank you, Your Honor.

20        THE COURT:  Thank you, Mr. Snow.

21        Anything further, Mr. Macchiaroli, from you?

22        MR. MACCHIAROLI:  No, Your Honor.

23        THE COURT:  All right.  Ms. Prout, anything

24   further from you?

25        MS. PROUT:  No, Your Honor.

1          THE COURT:  All right.

2              I have assessed the particular facts of this case

3      in light of the 3553(a) factors, and I now want to provide

4      my thoughts for the record; for counsel; and for you,

5      Mr. Snow, about my considerations in regard to the nature of

6      the offense; the history -- your history and

7      characteristics, Mr. Snow; and the other factors I have to

8      consider here.

9              Let me begin with regard to the nature of the

10     offense.  And, you know, this is -- in some ways, this is

11     the hardest aspect of these cases that my colleagues and I

12     have to grapple with and separating out the overall event

13     from the particular conduct of each person that participated

14     in that event.  I think they're both relevant because even

15     -- every individual person contributed to a whole, but on

16     the other hand, when we look to hold people accountable for

17     their actions, we look principally to their own actions and

18     not to the actions of those around them.  And so, you know,

19     it's a challenge.  But looking, first, at the overall nature

20     of what happened that day, I said this on many occasions;

21     that -- and I think, you know, Mr. Snow -- I don't think

22     he's going to -- he would contest anything about what I'm

23     about to say, you know?  What happened that day was as

24     serious an offense as there can be, given that the effect of

25     it was to disrupt the peaceful transfer of power from one

1    president to another.  There was a lot of damage that --

2    done that day.  It was tangible damage.  It was intangible

3    damage.  And, you know, again, we'll talk about it more in a

4    moment.  Mr. Snow's role that day was extremely limited.

5    That's for sure.  And we'll, kind of, circle back to that.

6    But I do have to consider the overall nature and

7    circumstances of the offense.  And so I do have to put what

8    Mr. Snow did in context and talk for a moment about the

9    overall events of January 6th.

10           Mr. Snow, you know, our constitution and our laws

11   give you rights that people in other countries would do just

12   about anything for and that many Americans that came before

13   me and you died for, frankly.  You're someone, by virtue of

14   your military service, who was prepared to do that.  You and

15   all Americans have the right to vote for whoever they want

16   to for president; they have the First Amendment right to

17   speak out in favor of the candidate they want to win; to put

18   up signs to convince their friends and family to vote for

19   that person; and if they don't like how an election is

20   conducted, they can speak out about that, too.  They can

21   call or write or try to meet with elected officials in their

22   state or in the Federal Government; they can get -- try to

23   get election laws changed; they can involve -- and even

24   engage in peaceful protest; and if you think you've been

25   wronged and have a case, you can file a lawsuit in state

1   court or federal court, but what -- but freedom means that

2   with those rights -- with all the rights we have come

3   responsibilities, and so what you cannot do under any

4   circumstances is become part of a mob that, using violence

5   and the threat of violence, disrupts Congress's ability to

6   fulfill its role to process the certification of the

7   Electoral College for president.  And, you know, again,

8   you've made no bones about it, Mr. Snow.  That, long and

9   short of it, is what you did.  You've been very candid that

10  there was nothing patriotic about it and it doesn't matter

11  how much you or I or anyone else doesn't like the way the

12  process of electing our next president is unfolding, but as

13  I said -- and Ms. Prout mentioned this directly -- I think

14  what happened that day was -- it damaged property; it

15  injured people; but it was, more importantly, a blow against

16  the customs and practices that help support the rule of law

17  and help support our constitution.  It snapped what was a

18  previously unbroken tradition of the peaceful transfer of

19  power, and we can't get that unbroken tradition back.  So it

20  was more than extremely serious.  It was a national

21  disgrace, what happened that day, and you played a small

22  role in that.

23          So let's turn to your role.  As I said, as

24  everyone agrees here, you were not part of any greater group

25  that organized or planned what happened that day; you did

1   not engage in any violence yourself; you had no weapon; you

2   did not fight police officers on that day.  I'd say, you

3   know, the Government points out a few small things that

4   might weigh against you to some degree; that you seemed to

5   egg on others a little bit by patting people on the back and

6   waving them in, and I would say one thing weighs a little

7   bit against you also is that you did penetrate relatively

8   far into the building, but, look, in the grand scheme of

9   what people did that day, these are things that, I guess, I

10  understand the Government pointing out, but it -- really, on

11  the scale of conduct, we're talking about things that are

12  really at the far end in terms of them not being serious.

13  And so, you know, it's a strange thing.  The event -- the

14  greater event that day was very bad for all the reasons I

15  laid out, but your role -- your personal role here was -- I

16  won't say it's quite as minor as it could have been, but

17  it's close.  It's close.

18          And then we turn -- I have to consider your

19  characteristics as an offender.  And these really do weigh,

20  I think, in your favor almost completely and strongly.

21  First, we start with the fact that you -- no -- you have no

22  criminal history whatsoever.  You served the country

23  honorably in the past.  And, you know, I -- look, I weigh a

24  lot your -- the way you took responsibility for what you

25  did, the way -- and the way you sought to resolve the case

1    quickly and cooperate with the Government.  It's not -- yes,

2    Ms. Prout is right.  It's not what prosecutors often call,

3    you know -- the kind of cooperation that gets you some big

4    cut in your sentence, but that's not really what -- the

5    point of what we're talking here.  What we're talking about

6    is somebody who understood -- whether they understood what

7    they did was wrong and wanted to make amends and, you know,

8    I -- look, you can always talk about some other thing

9    someone could have done, but more or less, I think you've

10   shown -- you've -- the efforts you made to take

11   responsibility were really, again, at the far end of the

12   scale in terms of showing a willingness to -- a -- wanting

13   -- a desire to do that.

14           And your statement, I thought, was -- both your

15   statement to me today and your written statement really, I

16   thought, seemed very heartfelt to me and was really spot on,

17   you know?  I -- a lot of this is trying to make sure, from

18   my perspective, when I see people who have come in and pled

19   guilty to all types of crimes, but in particular, the

20   January 6th crimes -- because there is a feeling out there

21   that, Gee, folks didn't do anything wrong, in some corners.

22   You haven't equivocated.  You haven't stayed silent.  You've

23   taken responsibility, I think, in a way that makes me know

24   that you understand what happened was wrong and why, and I

25   think, look, just like it would for any defendant, that goes

1      -- that plays a big role here.

2              I do have to consider the seriousness of the -- a

3      sentence that reflects the seriousness of the offense.  I

4      have to consider respect for the law, just punishment for

5      the defense [sic], deterrence to criminal conduct,

6      protecting the public from future crimes, similar to the --

7      so future crimes of you, which I don't have much of a

8      concern about, but future crimes that other folks might

9      commit, and I have to consider the need to provide

10     rehabilitation.

11             Look, I do think the need for general deterrence

12     is critical.  The Government has made that point.  We --

13     none of us want to see another January 6th occur.  And so

14     that is important.  But I think -- for all the reasons I

15     described about what -- characterizing what happened on

16     January 6th, but in many of these other cases, I think, for

17     many of these other -- when I weigh a lot of these other

18     factors, yes, they weigh in the balance, but I don't think

19     they -- but to cut to the chase, I'm going to end up

20     concluding that I don't think they mean you have to serve

21     any time in prison, Mr. Snow.

22             I have to consider the types of sentences

23     available.  We've talked about them.  Mr. Snow and the

24     Probation Office are asking for probation of various

25     flavors.  The Government is asking for 15 days'

1    incarceration and 3 years' probation and 60 hours of

2    community service.

3             I also have to consider unwanted sentence

4    disparities.  Both sides have cited to me cases they have

5    urged are similar to yours, Mr. Snow, and I've looked at

6    those cases.  I looked at the cases that I've sentenced as

7    well as cases other judges have sentenced to try to see

8    where I think this case falls.

9             And I have to consider the need to provide

10   restitution.  And in this case, the parties have agreed on

11   an amount of restitution, $500.

12            So look, considering all the 3553(a) factors and

13   considering what is sufficient but not greater than

14   necessary to comply with the purpose of sentence, I'm not

15   going to sentence Mr. Snow to any incarceration.  I am going

16   to sentence him, though, to 12 months of probation, $500 in

17   restitution, and the 60 hours in community service.

18            Mr. Snow, I think you're the first January 6th

19   defendant for whom I have not sentenced to a period of, if

20   not jail for some cases, a period of home confinement as a

21   condition of probation, but I think -- all in all in this

22   case, I don't think that is necessary, and I'm not going to

23   make you do that.  On the other hand, as -- I'm not going to

24   go as far as you argued, sentencing you to only a short

25   period of unsupervised probation.  I do think -- I mean, I

1    understand you have those health issues you need to attend

2    to, but I do think you should make amends by performing some

3    community service.  I think that is something that, once you

4    health -- have your health issues taken care of, I don't see

5    any reason you won't be able to complete.  And I'll just say

6    this.  I think I heard you and, Mr. Macchiaroli, the

7    arguments you made about the various reasons why you didn't

8    think -- you urged me to sentence Mr. Snow to a very short

9    period of unsupervised probation.  I'll just say this.

10   Obviously, Mr. Snow's got to get his health situation taken

11   care of.  Once he -- I'll just put on the record that I

12   think -- once he completes his community service, I think

13   he's a fine candidate, if he complies in all of the other

14   ways, to terminate his probation early if that is something

15   that you all want to pursue.  He'll, you know -- he'll have

16   to, obviously, complete the community service, but if that's

17   -- but I'll just put that on the record that I think he'd be

18   a good candidate for that if -- once those hours of

19   community service are taken care of.

20           I'll say a few other quick things before

21   pronouncing sentence.  Mr. Snow, it was mentioned in the --

22   your -- in your sentencing memo about -- and Mr. Macchiaroli

23   mentioned, again, today -- that you've received threats.  I

24   hope, first of all, to make very clear that, you know, just

25   as what folks on January 6th did undermined the rule of law

1   with that conduct, the conduct of making a threat against

2   someone who's -- no matter what crime they may be accused of

3   committing, also undermines the rule of law.  And I hope, if

4   those threats rise to the level of -- if what is coming your

5   way rises to the level of a crime, that you continue to

6   report those to law enforcement, and there's no place for

7   that in our society, number one.

8            And, number two, Mr. Snow, you mentioned on your

9   -- in your letter, you know, that this wasn't the legacy

10  that you hoped to leave your kids and your grandkids.  And I

11  just want to say that, you know, we're a country of second

12  chances and we're a country where, when people -- that give,

13  you know -- that give people ample opportunity to make up

14  for mistakes that they make, and I think you're well on your

15  way to leaving a legacy of having honorably made amends for

16  a mistake you made, a very serious mistake, for sure, but

17  having honorably made amends for that mistake, and that's --

18  that is something, I think, you can be proud of as far as

19  with regard to your kids and your grandkids and your great

20  grandkids.

21            So I will now impose the sentence, then, which I

22  conclude, after considering all the 3553(a) factors, is

23  sufficient but not greater than necessary to comply with the

24  purposes of sentencing.

25            Pursuant to the Sentencing Reform Act of 1984 and

1    in consideration of the provisions of 18 United States Code

2    Section 3553 as well as the advisory sentencing guidelines,

3    it is the judgment of the Court that you, Robert Thomas

4    Snow, are hereby sentenced to a term of 12 months, or 1

5    year, of probation on Count 4.  In addition, you are ordered

6    to pay a special assessment of $10 in addition -- in

7    accordance with 18 United States Code Section 3013.

8         While on supervision, you shall abide by the

9    following mandatory conditions as well as the standard

10   conditions of supervision which are imposed to establish the

11   basic expectations for your conduct while on supervision.

12        The mandatory conditions include, one, you must

13   not commit another federal, state, or local crime.

14        Two, you must not unlawfully possess a controlled

15   substance.

16        Three, the mandatory drug testing condition is

17   suspended based on my determination that you pose a low risk

18   of future substance abuse.

19        Three [sic], you must make restitution in

20   accordance with 18 United States Code Section 3663 and 3663A

21   or any other statute authorizing a sentence of restitution.

22        I will authorize the supervision and jurisdiction

23   of this case to be transferred to the United States District

24   Court for the Eastern District of Arkansas.

25        I -- you are ordered to make restitution in the

1    amount of $500 to the Architect of the Capitol.  The Court

2    determines that you do not have the ability to pay interest

3    and, therefore, waives any interest or penalties that may

4    accrue on the balance, although it doesn't sound like that

5    is going to happen.

6              You shall also comply with the following special

7    conditions:

8              Firearm restriction.  One, you shall remove

9    firearms, destructive devices, and other dangerous weapons

10   from areas over which you have access or control until the

11   term of supervision expires.

12             And community service.  You must complete 60 hours

13   of community service within 12 months.  The probation

14   officer will supervise the participation in the program by

15   approving the program, and you must provide written

16   verification of the completed hours to the probation

17   officer.

18             I will find that you do not have the ability to

19   pay a fine and, therefore, I waive -- will waive imposition

20   of a fine in this case.

21             Restitution payments shall be made to the Clerk of

22   the Court for the United States District Court, District of

23   Columbia, for disbursement to the following victim.  The

24   victim name is the Architect of the Capitol, Officer --

25   Office of the Chief Financial Officer, attention: Kathy

1    Sherrill, CPA, Ford House Office Building, Room H2-205B,

2    Washington, D.C. 20515.  The amount of loss is $500.

3         Financial obligations are immediately payable to

4    the Clerk of the Court for the U.S. District Court, 333

5    Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

6    days of any change of address, you shall notify the Clerk of

7    Court of the change until such time as the financial

8    obligation is paid in full.

9         The Probation Office shall release the presentence

10   investigation report to all appropriate agencies which

11   includes the United States Probation Office in the approved

12   District of residence.  In order to execute the sentence of

13   the Court, treatment agencies shall return the presentence

14   report to the Probation Office upon the defendant's

15   completion or termination from treatment.

16        Pursuant to 18 United States Code 3742, you have a

17   right to appeal the sentence imposed by this Court if the

18   period of imprisonment is longer than the statutory maximum.

19   If you choose to appeal, you must file any appeal within 14

20   days after the Court enters judgment.  If you are unable to

21   afford the costs of an appeal, you may request permission

22   from the Court to file an appeal without costs to you.

23        And finally, pursuant to the D.C. Circuit's

24   opinion in United States v. Hunter, 809 F.3d 677, decided on

25   January 12th, 2016, are there any objections to the sentence

```
 1    imposed that are not already noted on the record?

 2                Ms. Prout?

 3                MS. PROUT:  Not for the Government, Your Honor.

 4                THE COURT:  All right.  Mr. Macchiaroli?

 5                MR. MACCHIAROLI:  No additional objections, Your

 6    Honor.

 7                THE COURT:  All right.  Very well.

 8                Ms. -- that concludes my judgment in this case.

 9                Ms. Prout, is there a motion to dismiss additional

10    counts of the charging document?

11                MS. PROUT:  Yes.  The Government so moves, Your

12    Honor.

13                THE COURT:  All right.  That motion will be

14    granted.

15                Is there anything further, then, from you,

16    Ms. Prout?

17                MS. PROUT:  No, Your Honor.

18                THE COURT:  Anything further from you,

19    Mr. Macchiaroli?

20                MR. MACCHIAROLI:  No, Your Honor.

21                THE COURT:  All right.

22                Good luck, Mr. Snow.  Good luck, Mr. Snow, in

23    making amends.  As I mentioned, the case is going to be

24    transferred to Arkansas.  And, again, to the extent you

25    complete your community service and want to terminate your
```

1  probation early, you'll be able to make a motion in --

2  before the judge who is supervising the case there.

3          If there's nothing further, then, the parties are

4  dismissed.

5          THE DEFENDANT:  Thank you, Your Honor.

6          MS. PROUT:  Thank you.

7          (Proceedings concluded at 11:26 a.m.)

8                  * * * * * * * * * * * *

9              CERTIFICATE OF OFFICIAL COURT REPORTER

10    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

11  that the above and foregoing constitutes a true and accurate

12  transcript of my stenographic notes and is a full, true and

13  complete transcript of the proceedings to the best of my

14  ability, dated this 29th day of July 2022.

15    Please note:  This hearing occurred during the COVID-19

16  pandemic and is, therefore, subject to the technological

17  limitations of court reporting remotely.

18                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
19                              United States Courthouse
                                Room 6722
20                              333 Constitution Avenue, NW
                                Washington, DC 20001

21

22

23

24

25